ERIC W. SWANIS, ESQ.
Nevada Bar No. 6840
DANIEL MILLER, ESQ.
Nevada Bar No. 17255
**GREENBERG TRAURIG, LLP**
10845 Griffith Peak Drive, Suite 600
Las Vegas, NV 89135
Telephone: (702) 792-3773
E-mail: swanise@gtlaw.com
daniel.miller@gtlaw.com

*Attorneys for Plaintiffs*

GREENBERG TRAURIG, LLP
10845 Griffith Peak Dr., Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

KRYPTONITE PRODUCTS, INC., a Wyoming Corporation; and DURAMAX STORE, INC., a Nevada Corporation,

Plaintiffs,

v.

AXIOM SUPPLY LLC, a limited liability company; JOSH ARONSON, an individual,

Defendants.

CASE NO.:

**COMPLAINT**

## COMPLAINT

Plaintiffs KRYPTONITE PRODUCTS, INC. (“Kryptonite”) and DURAMAX STORE, INC. (“Duramax” and together with Kryptonite, “Plaintiffs”), by and through its counsel, the law firm of Greenberg Traurig LLP, hereby files this complaint against Defendants, AXIOM SUPPLY (“Axiom”) and JOSH ARONSON (“Josh” and together with Axiom, “Defendants”) and alleges as follows:

## THE PARTIES

1. Plaintiff KRYPTONITE is and was a Wyoming corporation with its principal place of operations and headquarters in Nevada.

2. Plaintiff DURAMAX is and was a Nevada corporation with its principal place of operations and headquarters in Nevada.

3. At all times relevant, Defendant AXIOM is and was a Nevada limited liability company with its principal place of operations and headquarters in Nevada.

4. At all times relevant, Defendant Aronson is and was a citizen and domiciliary of the State of Nevada.

## JURISDICTION AND VENUE

5. This dispute includes claims brought under the Federal Defend Trade Secrets Act. *See* 18 U.S.C. § 1836, *st seq*.

6. Accordingly, this Court has jurisdiction over the instant dispute under 28 U.S.C. §§ 1331; 1367.

7. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1–2), because the events giving rise to this claim occurred within the District of Nevada and the defendants are residents of the State of Nevada.

## FACTUAL ALLEGATIONS

### A. Josh Aronson's Role at Kryptonite and Duramax

8. Aronson was hired by Duramax on or about March 21, 2017. **Exhibit A (Employment Contract)**.

9. Aronson served as the general manager for Duramax during his tenure with Duramax.

10. Duramax is a store and retailer of aftermarket off-roading accessories and parts.

11. Kryptonite is a later created company by the founders of Duramax, which focused on the design and sale of aftermarket off-roading accessories and parts.

12. Duramax served as the fulfillment partner for Kryptonite, storing, marketing, selling, and distributing the parts and accessories designed and manufactured by Kryptonite.

13. As a result of this relationship, Duramax personnel held key roles in Kryptonite pursuant to the fulfilment agreements.

14. Aronson, as general manager of Duramax, also had responsibilities to Kryptonite under the terms of the fulfillment agreements.

15. These responsibilities included: (1) maintaining and managing the network of suppliers who constructed Kryptonite products, and delivered them to Duramax for sale; (2) selling

GREENBERG TRAURIG, LLP
10845 Griffith Peak Dr., Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

GREENBERG TRAURIG, LLP
10845 Griffith Peak Dr., Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

Kryptonite products both directly and to third party distributors; (3) managing relationships, pricing, volume discounts and other aspects of a nationwide distribution network; and (4) marketing new and existing products.

16. Accordingly, Aronson obtained confidential trade secret information concerning Kryptonite's marketing, pricing, supply and distribution chain networks, profitability, and virtually every other aspect of the business of creating and distributing aftermarket parts in his role as general manager for Duramax.

17. Aronson also obtained the same kind of information concerning pricing, volume, costs of manufacture, and profitability concerning the operations of his former employer Duramax.

18. Aronson's original employment agreement made clear that he had an obligation to keep confidential all proprietary and sensitive information learned in the course and scope of his employment. *See* **Exhibit A.**

19. These obligations were reiterated and extended to Kryptonite in a Confidentiality and Non-Compete Agreement executed on or about August 2, 2018. *See* **Exhibit B.**

**B. Aronson forms Axiom while working for Duramax and Kryptonite with the aim of copying their business model and undercutting their pricing.**

20. In 2019, while working for Duramax and Kryptonite, Aronson registered a URL for Axiom Supply.

21. On January 5, 2023, Aronson formally formed Axiom Supply LLC by registering it with the Secretary of State.

22. Aronson never told anyone at Duramax or Kryptonite that he intended to or had in fact opened this competing business.

23. Instead, Aronson continued working for Duramax and Kryptonite, and thus Aronson and by extension Axiom continued to improperly obtain confidential and trade secret information of Duramax and Kryptonite for their own use and benefit.

24. Upon information and belief, Aronson is and at all material points was the ultimate owner and control person of Axiom.

25. Upon information and belief, until shortly after Aronson left his position at Duramax, he was the sole employee and/or agent of Axiom.

26. In August 2023, Duramax and Aronson executed a binding arbitration agreement, which required that claims as between Duramax and Aronson must be arbitrated, except insofar as such arbitration was prohibited by law or injunctive relief was sought. *See* **Exhibit C.**[1]

27. On December 12, 2023, the domain Aronson previously registered (axiomsupply.com) was updated.

**C. Axiom and Aronson use Aronson's position as a key insider at Duramax and Kryptonite to build goodwill for Aronson with critical Duramax and Kryptonite partners.**

28. Beginning at least as early as 2025, while Aronson remained employed by Duramax and while he performed work for both Duramax and Kryptonite, Aronson began cutting a series of unfavorable deals for Duramax and Kryptonite.

29. Aronson was authorized by Duramax and Kryptonite to offer discounts to large volume sellers according to a confidential and proprietary discount matrix.

30. Aronson disregarded the applicable pricing policies to offer preferred vendors special pricing, which was not authorized by Duramax and Kryptonite.

31. Aronson did this both by exceeding the allowable discount for smaller volume sellers and by offering discounts above the maximum allowable discount.

32. When confronted with his violations of policy, Aronson claimed ignorance of the policy and Duramax and Kryptonite instructed him to conform his conduct to company policy.

33. Aronson agreed to do so.

34. Aronson immediately went back to cutting special deals with his favored suppliers.

35. Those deals included up to 50%, far exceeding the maximum allowable discount of 35%.

36. As a consequence of those deals, Duramax and Kryptonite lost money on parts sold to the beneficiaries of Aronson's backroom deals.

---

[1] For this reason, claims concerning Aronson's breach of contract, breach of his duty of loyalty and other similar claims are not included in this Complaint.

GREENBERG TRAURIG, LLP
10845 Griffith Peak Dr., Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

37. Upon information and belief, those deals were cut to improve Aronson's, and by extension, Axiom's standing with critical Duramax and Kryptonite partners so as to permit Axiom to launch with built in good will from Duramax and Kryptonite dealers because they would associate Axiom and its owner with the impossibly good deals they received from Aronson.

38. A number of those dealers did in fact go on to sell Axiom products after Aronson left Duramax.

39. Aronson also permitted dealer accounts to accrue large accounts receivable balances in contravention of company policy.

40. When the accounts receivable balances grew too substantial, Aronson attempted to cover up the shortfall by charging outstanding balances to his personal credit card.

**D. Axiom and Aronson stole confidential information, altered protected computer systems, and engaged in other misconduct just prior to Aronson's departure.**

GREENBERG TRAURIG, LLP
10845 Griffith Peak Dr., Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

41. To preserve Axiom and Aronson's ability to harvest as any of Duramax and Kryptonite trade secrets prior to fully launching Axiom as an operating business, Aronson on behalf of Axiom abused his access to Duramax and Kryptonite systems to manually alter payment records kept with Shopify: a third-party vendor.

42. They did this to obscure the accounts receivable balance, payment activity and history, and to interfere with Duramax and Kryptonite's ability to manage their dealer relationships appropriately after his departure.

43. Aronson also misappropriated at least $8,781.93, in credits and corporate reward points accrued by Duramax and Kryptonite.

44. Upon information and belief, those misappropriated funds were used both for Mr. Aronson's personal use and to benefit Axiom as it drew closer to becoming an operational competitor to Duramax and Kryptonite.

45. Aronson also began cancelling retail orders and redirecting those orders to his preferred retailers between June and August 2025.

46. Upon information and belief that redirection was performed to ensure that Axiom continued to strengthen its bond with key dealers for Duramax and Kryptonite ahead of their anticipated launch.

47. Similarly, Aronson freely granted refunds and returns without approval for those same dealers during this period.

48. Again, upon information and belief this was done to ensure that Axiom had banked enough good will to ensure its successful launch.

49. These actions directly and impermissibly harmed Kryptonite and Duramax to the benefit of Axiom and its principal Aronson.

50. As Duramax and Kryptonite began to unravel what Aronson had been doing and asking questions to unravel the web of deception used to hide Aronson's abuse of his position, Aronson moved closer and closer to the public launch of Axiom.

51. On August 13, 2025, rather than respond to the ever increasing questions about what he was doing, Aronson resigned from his position at Duramax.

52. On August 25, 2025, Aronson executed voluntary termination documents, including a release agreement.

53. In the release agreement Aronson represented that he returned all of Duramax and Kryptonite property—including intellectual property—in his possession, and reaffirmed his obligations to maintain confidentiality.

**E. Aronson Launches Axiom, and Duramax and Kryptonite learn that Axiom and Aronson had stolen from them.**

54. On August 28, 2025, a mere three days after Aronson signed the voluntary termination documents, he publicly launched Axiom, by pushing content to its website.

55. Concerned that Aronson had breached his obligations to them and stolen company property, Duramax and Kryptonite immediately hired a forensic analyst to review his company computer.

56. On or about September 5, 2026, the forensic investigator accessed and preserved the hard drives from that computer so that he could conduct forensic imaging of the drives.

GREENBERG TRAURIG, LLP
10845 Griffith Peak Dr., Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

GREENBERG TRAURIG, LLP
10845 Griffith Peak Dr., Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

57. In the course of that investigation, the forensic investigator discovered a disturbing set of facts.

58. The investigator first discovered signs of deleted files, which resisted his efforts to recover them. After additional efforts to recover a key corrupted database were successful, the investigator was able to determine that sensitive files were permanently and irretrievably deleted.

59. The deleted files included any and all record of what files Aronson might have downloaded from the Duramax or Kryptonite's servers.

60. Between August 12 and August 13 (the day Aronson resigned), the investigator discovered additional concerning activity.

61. For example, Aronson had accessed Duramax and Kryptonite's Shopify account, which contains a complete list of what the Plaintiffs sold, when, to who, and how much. In sum, the exported Shopify data contained a blueprint in miniature to Duramax and Kryptonite's business, and insight for competitors as to what customers might be easily poached.

62. Access to this sensitive information was restricted to only trusted executives with duties to maintain confidentiality.

63. Aronson also accessed additional sensitive information, uploaded information to at least three separate cloud storage accounts, and logged into an incognito mode Chrome web browser for an extended period of time.

64. The transfers to cloud storage were of a sufficient size to cover up an effort to steal Duramax and Kryptonite's data and send it off to a competitor.

65. Upon information and belief Aronson transmitted sensitive and confidential commercial information such as the Shopify account data to Axiom for Axiom's use and benefit.

66. The investigator also found evidence that USB drives had been used in the past, but logging of when such drives were used was not enabled on the device.

67. After the transfers were completed, Aronson intentionally took steps to delete file access history, files, account settings, and to disconnect the device from the OneDrive cloud.

68. The deleted files could not be recovered, preventing a more exact description of the local files taken by Aronson and Axiom.

69. But, upon information and belief, the files taken included additional confidential and trade secret information, including but not limited to pricing schedules, marketing materials, customer lists, plans for future development and other intellectual property.

70. Indeed, Aronson accessed such files during this period but, because of his efforts to cover his tracks, it could not be immediately ascertained what was ultimately done with the sensitive files he accessed.

71. This behavior was highly unusual and indicative of efforts to remove data from Duramax and Kryptonite's protected systems.

**F. Duramax and Kryptonite confront Aronson and he reassures them that he did not take or use Duramax and Kryptonite's sensitive information**

72. Duramax and Kryptonite sent a cease and desist and demand letter to Aronson and Axiom addressing the requirement that they destroy and not use confidential information taken from Duramax and Kryptonite.

73. Aronson and Axiom disavowed ever using such information or having an intent to use such information.

74. Aronson had been a longtime personal friend of Duramax and Kryptonite's principal, so Duramax and Kryptonite believed Aronson and Axiom when they made these reassurances.

75. But, in 2026, Axiom and Aronson then launched substantially identical products, marketing campaigns, and took steps to ensure that they undercut Duramax and Kryptonite's private price structure with their dealers.

76. Compounding this, Axiom and Aronson then began a deliberate campaign to recruit away additional key personnel at Duramax and Kryptonite.

77. Apparently, not content with the information they already stole, the defendants were determined to take key personnel and whatever confidential information those individuals had that Axiom had not yet stolen.

78. Using this information, Axiom continued to deliberately peg its prices below those of Duramax and Kryptonite, even as they changed their pricing strategies.

GREENBERG TRAURIG, LLP
10845 Griffith Peak Dr., Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

79. Axiom and Aronson thereby used wrongfully obtained insider information to directly compete with Duramax and Kryptonite and to undercut them in the market.

## FIRST CAUSE OF ACTION

**(Violations of the Computer Fraud and Abuse Act and the Nevada Unlawful Acts Regarding Computers Act—Against Aronson and Axiom)**

80. Plaintiffs incorporate the allegations set forth above as if fully restated herein.

81. Access to Duramax and Kryptonite's Shopify and other confidential records were restricted to essential personnel.

82. Both sets of computer systems were protected computers as they were used in or affected interstate or foreign commerce or communications, as provided for by 18 U.S.C. § 1030.

83. Specifically, the computer systems at issue were used to manage vendors, suppliers, and sales nationwide, and abroad.

84. Axiom had no right to access, distribute, read, write, or otherwise use the materials contained in the protected computers.

85. Nevertheless, Axiom by and through its principal Aronson, did access, alter, and copy the information contained in such systems for its own benefit.

86. Axion's access and use of the materials was therefore unauthorized and unlawful under both 18 U.S.C. § 1030 and NRS §§ 205.4765; 205.511(2).

87. While Aronson did have authorization to access the systems, he was never authorized to export, delete, or alter critical corporate records.

88. Accordingly, Aronson's actions were also unauthorized and unlawful under both 18 U.S.C. § 1030 and NRS §§ 205.4765; 205.511(2).

89. Duramax and Kryptonite are authorized to bring a private right of action under the CFAA to obtain compensatory damages and injunctive relief or other equitable relief.

90. Duramax and Kryptonite are authorized to bring a private right of action under the Unlawful Acts Regarding Computers and Information Services Act for: (1) its damages; (2) punitive damages; and (3) its costs and attorney fees in bringing this action.

GREENBERG TRAURIG, LLP
10845 Griffith Peak Dr., Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

GREENBERG TRAURIG, LLP
10845 Griffith Peak Dr., Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

## SECOND CAUSE OF ACTION

**(Corporate Espionage and Misappropriation of Trade Secrets Violating 18 U.S.C. § 1836, *et seq.*, and NRS §600A, *et seq.*—Against Aronson and Axiom)**

91. Plaintiffs incorporate the allegations set forth above as if fully restated herein.

92. Duramax and Kryptonite's customer lists, pricing schedules, marketing materials, and product development plans and processes were all trade secrets.

93. Duramax and Kryptonite protected such secrets by restricting access to them and by requiring personal who would learn of the trade secrets to sign contracts obligating such personnel to keep that information confidential.

94. Axiom was formed years before Aronson's departure.

95. Axiom intended for years to acquire as many valuable trade secrets as possible from Duramax and Kryptonite, so that it could launch essentially a duplicate set of products.

96. Aronson was obligated to keep this information confidential, but did not do so and instead provided it to Axiom a direct competitor.

97. Axiom then knowingly used the wrongfully obtained trade secrets to inform its entire business strategy and launch directly competing products, including using Kryptonite's packaging vendors to utilize deceptively similar packaging as Kryptonite's.

98. Plaintiffs seek their actual damages in an amount to be determined at trial, as well as punitive damages, attorneys' fees, and injunctive relief, ordering the return of confidential materials and barring the defendants from using such information in the future.

## THIRD CAUSE OF ACTION

**(Intentional Interference with contractual relations and prospective economic advantage—Against Aronson and Axiom)**

99. Plaintiffs incorporate the allegations set forth above as if fully restated herein.

100. Axiom and Aronson knew of and intentionally interfered with contracts between Duramax and Kryptonite and their suppliers and vendors.

101. Axiom and Aronson did this by intentionally using wrongfully and illegally obtained trade secrets and confidential information.

GREENBERG TRAURIG, LLP
10845 Griffith Peak Dr., Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

102. Axiom and Aronson further did this through artificial price manipulation. By significantly discounting Duramax and Kryptonite products, while Aronson was an insider, Axiom was able to create the impression that Duramax and Kryptonite products could be sold at a much lower price than was actually profitable.

103. When the artificial and unprofitably low prices were discovered, Duramax and Kryptonite had to increase prices to turn a profit.

104. Those increases in prices had the effect that Axiom wanted, namely, it made customers dissatisfied.

105. This price manipulation helped Axiom steal market share and convince dealers to do business with Axiom rather than Duramax and Kryptonite, because Axiom then used its insider knowledge of the deals those dealers were getting from Aronson, to sell their products in between the price point Duramax and Kryptonite had targeted and the artificially low price that Aronson had previously sold their products at.

106. As a result, many dealers moved to sell Axiom products, damaging Duramax and Kryptonite.

107. As a result of these actions Duramax and Kryptonite are entitled to damages to be determined at trial.

## FOURTH CAUSE OF ACTION

**(Common Law Unfair competition, *et seq.*—Against Axiom)**

108. Plaintiffs incorporate the allegations set forth above as if fully restated herein.

109. Kryptonite has established protectable rights in its name, branding, and product designs. Axiom's use of confusingly similar branding, logos, and product designs is likely to confuse, cause mistake, or deceive an appreciable number of reasonable customers, and constitutes unfair competition.

110. Axiom, by and through its agents, stole protected trade secrets, including customer lists, pricing schedules, suppliers, marketing materials, product design, and other information from Duramax and Kryptonite.

GREENBERG TRAURIG, LLP
10845 Griffith Peak Dr., Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

111. Axiom then used that information to create directly competing products and marketing campaigns to those of Duramax and Kryptonite.

112. Axiom also used its knowledge of Duramax and Kryptonite's supplier networks to ensure that in many cases they used the same suppliers in China who already knew how to build (and therefore how to copy) Duramax and Kryptonite's products.

113. Axiom then copied the products, the marketing, and used the stolen pricing information to undercut Kryptonite and Duramax.

114. As a direct and proximate result, Kryptonite has suffered damages and is entitled to damages and injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for relief as follows:

1. Compensatory damages in an amount in excess of $75,000;
2. Special damages;
3. Preliminary and permanent injunctive relief;
4. Exemplary damages and attorney fees;
5. Disgorgement/constructive trust;
6. Punitive damages;
7. Pre-judgment and post-judgment interest as allowed by law;
8. For costs of suit and reasonable attorney fees as allowed by law and in an amount to be determined; and
9. For such other and further relief that the Court may deem just and proper.

DATED this 21st day of August, 2026.

**GREENBERG TRAURIG, LLP**

*/s/ Eric W. Swanis*
ERIC W. SWANIS, ESQ.
Nevada Bar No. 6840
DANIEL MILLER, ESQ.
Nevada Bar No. 17255
10845 Griffith Peak Drive, Suite 600
Las Vegas, Nevada 89135
*Attorneys for Plaintiffs*

GREENBERG TRAURIG, LLP
10845 Griffith Peak Dr., Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

**INDEX OF EXHIBITS**

| | |
|---|---|
| **EXHIBIT A** | **2023.08.29 Binding Arbitration Agreement** |
| **EXHIBIT B** | **2018.08.02 Confidentiality and Noncompete Employment Agreement** |
| **EXHIBIT C** | **2017.03.21 Confidentiality and Noncompete Employment Agreement** |